[Cite as *Burnett v. Ohio Dept. of Transp.*, 2016-Ohio-5501.]

| | |
|---|---|
| DAN BURNETT | Case No. 2012-01937 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF TRANSPORTATION, et al. | |
| Defendants | |

{¶1} Plaintiff brought this action for negligence alleging that on February 17, 2010, while he was operating a tractor-trailer on U.S. Route 30 in Allen County, a metal skid shoe broke off of the bottom of a snowplow on a truck being operated by an employee of defendant, Ohio Department of Transportation (ODOT), and, as a result, plaintiff sustained injuries when the tractor-trailer ran over the object. The parties stipulated on the issue of liability and the case proceeded to trial on the issue of damages.

{¶2} Plaintiff testified at trial that he began operating heavy equipment while serving in the Marine Corps in Vietnam, after which time he worked as a truck driver for several years in the 1970s before taking a job as a heavy equipment operator at a quarry in New Jersey. Plaintiff stated that he took an early retirement from that job when he was about 55 years old and decided to get back into the truck driving profession. Plaintiff stated that he soon relocated to Ohio and, after briefly working for a couple of different trucking companies, he was hired on a seasonal basis by United Parcel Service (UPS) in November 2008, and in May 2009 he began full-time employment with UPS Freight.

{¶3} Plaintiff testified that the UPS Freight job involved hauling a 53-foot-long box trailer behind a semi-truck with a sleeper cab on set routes to Owensboro, Kentucky

and to Chicago, Illinois, stopping at four or five points along each route to make deliveries at Advance Auto Parts stores. As plaintiff explained, he was responsible for unloading deliveries at the stores and also loading any returned merchandise into the trailer, using a pallet loader for some goods and carrying other goods by hand in plastic totes. Plaintiff stated that he typically drove the Chicago route twice a week, and he drove the Owensboro route once a week.

{¶4} Plaintiff testified that early in the morning on Wednesday, February 17, 2010, he left the freight yard out of which he operated in Delaware, Ohio and began a trip to Chicago, which included a stop along the way at an Advance Auto Parts store in Valparaiso, Indiana. Plaintiff related that he drove north to Upper Sandusky, Ohio and then headed west on U.S. Route 30 toward Valparaiso. Plaintiff testified that there was snow piled off to the side of the four-lane, divided highway, but the traveling lanes were free of ice and snow and he was able to travel at the 55 mile per hour speed limit.

{¶5} As plaintiff recounted, when he came up behind a car following an ODOT snowplow truck in the right lane, he moved into the left lane to pass both vehicles, but when he got alongside the car, his front left tire struck something and caused the truck to jerk toward the snow-covered median to the left. Plaintiff recalled that the truck then veered back to the right as he wrestled with the steering wheel, and although he thought for a moment he was going to collide with the car, he was able to gain control of the rig and pull off onto the right shoulder of the highway. According to plaintiff, the truck had shaken during this incident with such force that all the items in the overhead compartments had fallen out all over the cab. Plaintiff testified that when he got out of the cab, he saw that the left front tire of the truck was blown and the rim was damaged, a tire on the right side of the truck's drive axle was blown, and the fuel tank on the right side was punctured and leaking. Plaintiff stated that he phoned his employer to report what had happened, and he retrieved the spill kit from the truck and crawled underneath the truck to try to plug the leaking tank.

{¶6} According to plaintiff, an ODOT supervisor arrived at the scene and said the driver of the snowplow truck, who had continued on down the highway without stopping, called in to report an accident. Plaintiff stated that the ODOT supervisor asked if the Ohio State Highway Patrol (OSHP) had been called, and when plaintiff said no, the supervisor called OSHP. Plaintiff, who admitted that he did not feel any pain initially, testified that when an OSHP trooper arrived shortly thereafter and he gave a statement to the trooper, he told the trooper that he did not think he was hurt. Plaintiff stated that crews of hazardous materials specialists, mechanics, and tire changers were quickly dispatched to the scene by his employer, and he was back on the road about an hour later.

{¶7} Plaintiff testified that since he had only one functioning fuel tank at that point, he stopped up the road at the U.S. Route 30/Interstate Route 75 interchange, and at that point he started to notice some lower back pain, which he rated at a 3 on a scale of 1 to 10. Plaintiff stated that he took some ibuprofen and it dulled the pain after 20 to 30 minutes. Plaintiff related that after making stops in Valparaiso and in the Chicago area, he took a mandatory 10-hour break in Plainfield, Illinois, by which time the pain in his lower back had come back with more severity, at least an 8 on a scale of 1 to 10. Plaintiff testified that he took more ibuprofen and was able to sleep in the cab that night before returning to Delaware on Thursday, February 18, 2010.

{¶8} As plaintiff related, he rested at home while he was off duty for about 10 or 12 hours, but the lower back pain persisted. Plaintiff stated that when he prepared to leave for the Owensboro route around 2:30 a.m. on Friday, February 19, 2010, he was very sore and took more ibuprofen. Plaintiff stated that he took more ibuprofen later that day when he got to Owensboro, but it only reduced his pain to a 6 or 7 on a scale of 1 to 10, and after making his last stop in Terra Haute, Indiana, he returned home. Plaintiff testified that around midnight on Saturday, February 20, 2010, he drove to Chicago again. According to plaintiff, a couple of days later he noticed pain radiating

into his left hip, and on the afternoon of Tuesday, February 23, 2010, he was in such pain that he could not work, so he called in to notify his employer and he made an appointment with Bradley L. Kunz, M.D., a family doctor whom he had started seeing about a year earlier.

{¶9} Plaintiff acknowledged that he suffered intermittent back pain long before this incident, but he testified that the pain he was experiencing at this point was worse. According to plaintiff, at times in his career he carried ibuprofen in his lunchbox for relief of back pain, and occasionally his back pain had been severe enough that he visited walk-in pain clinics to get prescription-strength ibuprofen. Plaintiff testified, however, that he had never been diagnosed with a back injury or chronic back condition. Plaintiff explained that in the type of work that he performed, it was inevitable that one would experience back pain at times.

{¶10} Plaintiff testified that at his appointment with Dr. Kunz, he complained of pain in his lower back and left leg, but he did not mention the accident. Plaintiff stated that Dr. Kunz prescribed pain medication, which was effective but made him lethargic, and Dr. Kunz wrote a note to excuse him from work for a period of time. Plaintiff further stated that he continued to see Dr. Kunz through March and April 2010 and continued taking the prescription pain medication, but he still did not mention the accident to Dr. Kunz. According to plaintiff, Dr. Kunz ordered x-rays and then physical therapy, but the pain persisted and Dr. Kunz eventually ordered an MRI and referred him to Michael J. Meagher, M.D., a neurologist. As an aside, regarding the costs of his medical care and treatment, plaintiff testified that he and his counsel prepared a summary of his medical expenses and noted therein which bills he incurred out of pocket. (Plaintiff's Exhibit H.)

{¶11} Plaintiff stated that he remained off of work during this time. Plaintiff explained that on or about March 5, 2010, his girlfriend Cassandra Wiltz assisted him in applying to Aetna via telephone for short-term disability benefits that were available

through his employer. According to Aetna records, the reason for the application was recorded simply as illness, and it was specifically noted by a claim representative that the accident was not reported to be work-related or the result of an accident. (Defendants' Exhibit 2.)

{¶12} Similarly, plaintiff acknowledged that when he went to see Dr. Meagher and filled out a patient questionnaire on April 26, 2010, he indicated that the cause of his pain was unknown and not work-related. (Defendants' Exhibit 2, p. 1.) Plaintiff also acknowledged that he did not disclose his prior history of back pain to Dr. Meagher. Plaintiff testified that after Dr. Meagher reviewed the results of the MRI, he diagnosed plaintiff with a herniated disc impinging on the sciatic nerve. According to plaintiff, Dr. Meagher advised that one treatment option was to get a shot which apparently would offer some temporary relief, but Dr. Meagher recommended surgery and he referred plaintiff to Ward P. Buster, D.O. for surgical consultation. Plaintiff testified that it was during his appointment with Dr. Meagher, when he understood the severity of his injury, that he finally came to wonder if it might be related to the accident, and he mentioned this to Dr. Meagher, marking the first documented instance of plaintiff associating the two.

{¶13} Plaintiff stated that after a couple of visits with Dr. Buster, he elected to undergo a microdiscectomy operation which Dr. Buster performed on July 6, 2010. Plaintiff recalled that he had to stay overnight in the hospital due to a complication involving his blood pressure, but he stated that he felt good after the surgery. As plaintiff recounted, Dr. Buster prescribed muscle relaxers for him and he completed a course of physical therapy. Plaintiff testified that he eventually got to a point where all the lower back and left leg pain basically subsided, and Dr. Buster cleared him to return to work. Plaintiff also testified that on the advice of Dr. Buster, he filed a claim with the Ohio Bureau of Workers Compensation (BWC) in September 2010. (Defendants' Exhibit 3.) According to plaintiff, he initially asked Dr. Kunz to sign the paperwork for

the BWC claim, but Dr. Kunz referred him to another doctor in the same practice, Thomas Hubbell, M.D., who agreed to sign and later became plaintiff's primary care provider.

{¶14} Plaintiff recalled that he returned to work for UPS Freight on or about October 17, 2010, still delivering to Advance Auto Parts stores, albeit on a less favorable route schedule. Plaintiff stated that things went well at first and his lower back and left leg seemed fine. But, plaintiff went on to state that later on he began having some difficulty concentrating, he had a "cottony" feeling in his head and just did not feel like himself, and he noticed some lapses in his memory. Plaintiff stated that he also grew more and more concerned about his safety while driving, fearing that he would cause an accident. Plaintiff stated that on July 8, 2011, he felt lightheaded to the point that he went to the emergency room at Riverside Methodist Hospital in Columbus. (Defendants' Exhibit 2, p. 105.) Plaintiff testified that he had no real history of any psychological issues before, and he decided to see Dr. Kunz. Plaintiff related that Dr. Kunz diagnosed him with depressive disorder and prescribed an antidepressant.

{¶15} Plaintiff testified that he continued trying to work, but one day in late August 2011 when he went to the yard to pick up a load of freight at 2:00 a.m., his heart stated racing and he became overwhelmingly dizzy, lightheaded, nauseous, and fearful that he would have an accident if he drove the tractor-trailer that day. Plaintiff stated that he told the dispatcher he could not work that day, and indeed he never worked another day after that for UPS Freight. Plaintiff recalled that he telephoned Dr. Kunz's office that same day and made an appointment, and when he saw Kunz some time later for the appointment he was referred to a psychologist, Terry Imar.

{¶16} Plaintiff stated that he began attending psychotherapy sessions with Imar, and while he felt that his condition was better for a few days after the sessions, he would return to feeling depressed. Plaintiff stated that he also continued to suffer confusion and an inability to concentrate. In addition to his psychological issues,

plaintiff stated that by the latter part of 2011 he was experiencing some lower back pain. Plaintiff stated that it was significant enough that he went back to see Dr. Buster, and although Buster advised him to consider another surgery, he ultimately decided against it.

{¶17} Plaintiff testified that with the assistance of Imar, in the spring of 2012 he prepared an application to Met Life for long-term disability benefits available through his employer, based upon his psychological issues, and he was approved for the same and began receiving benefits. (Plaintiff's Exhibit L.) As plaintiff explained, as a condition of remaining on long-term disability, Met Life required that he apply for Social Security Disability Insurance (SSDI) benefits, which he did successfully. According to plaintiff, the long-term disability benefits are set to expire on March 2, 2017.

{¶18} As for the BWC claim that plaintiff initiated in September 2010 for the issues with his lower back, plaintiff testified that UPS Freight denied the claim, as did both a hearing officer and the Industrial Commission, but during the pendency of an appeal before the Allen County Common Pleas Court a settlement was reached in July 2013. (Defendants' Exhibit 3.) Plaintiff also testified that in 2014, he started receiving Medicare benefits.

{¶19} It was plaintiff's testimony that he has been unable to drive a truck since August 2011 due to both his lack of concentration and his lower back issues. But, it was acknowledged that at a deposition in February 2012 plaintiff attributed his inability to drive a truck only to his lack of concentration. Plaintiff allowed that he has essentially been able to manage whatever back pain he has experienced since the microdiscectomy with medication such as ibuprofen, like he had done for many years before, and although he has a prescription from Dr. Hubble for hydrocodone, it is a stronger medication than he needs. According to plaintiff, though, his back is weak and gets sore after sitting for about 45 minutes, and consequently he cannot sit in a truck for hours at a time, nor can he hook a truck up to a trailer.

{¶20} As plaintiff described, he continues to have difficulty concentrating, and although he has good days and bad days, it is mostly the latter. Plaintiff stated that he would like to return to driving trucks for a living, but he feels it would be unsafe to do so because of his concentration problems, and beyond that he stated that his concentration problems make him of no value to any kind of employer. Plaintiff acknowledged, though, that he purchased a recreational vehicle (RV) in April 2013, and was able to drive it without a problem, and he was able to perform some maintenance on it as well, although he eventually sold it. Plaintiff also acknowledged that he is able to drive his personal car without any problem, and he can drive his personal full-size van without any problem, and indeed until shortly before trial he owned and operated both a full-size conversion van and a full-size panel van, one of which was recently totaled in a collision. Plaintiff also testified about carrying on business ventures of his own during some of the relevant time period. Plaintiff acknowledged operating a part-time direct marketing business known as "EMerchantDan.com" after his separation from UPS Freight, and reporting income from the business on his tax returns. Plaintiff testified that he also used to go to yard sales and purchase items that he would peddle for resale at flea markets, which required him to load and unload merchandise from his panel van, and while he continued doing this for a while after his separation from UPS Freight, it was unprofitable and he has not done this for a couple of years now.

{¶21} According to plaintiff, he is unable to engage in the hobbies that he used to enjoy, such as walking, swimming, lifting weights, yard work, shopping for antiques, and automotive work and other tinkering around the house. Plaintiff stated that he also cannot keep up with housekeeping and yard work the way he used to, although he stated that he maintains his half-acre lot on his own for the most part, and he admitted that he recently moved around some large paving stores in his yard by himself. Still, plaintiff testified that his ego suffered a blow and he basically feels incapable of doing anything, and not working makes it feel like a part of himself has been lost. From

plaintiff's account, all facets of his life have been affected, and he has become irritable and confused to the point that it is difficult for him now to communicate with others and maintain interpersonal relationships.  It was established that plaintiff suffered a stroke in June 2015, and while he testified that he does not feel it significantly changed him, he was unsure whether it had affected his communication abilities.

{¶22} Plaintiff, whose date of birth is May 18, 1954, testified that he had planned on working for UPS Freight until at least age 65, and perhaps age 70.  Plaintiff stated that he did not have a retirement plan with UPS, but maintained his own retirement account, although he stated that he has nearly exhausted his personal savings. Regarding his desire to work, plaintiff acknowledged that he once wrote in a Facebook post about the pleasure of not having to crawl out of bed and go to a job anymore. Plaintiff's explanation for this was that he was involved in some kind of online educational program when he made that post and it was essentially a sales tactic that he was supposed to use as part of the program in order to recruit others to participate.

{¶23} Terry Imar, a psychologist, testified that plaintiff began seeing him for psychotherapy sessions on October 3, 2011, based on a referral from Dr. Kunz.  Imar, who cannot prescribe medication, testified that Dr. Kunz had started plaintiff on an antidepressant shortly before he began seeing plaintiff.  Imar explained that his goal in psychotherapy sessions like those he had with plaintiff is to assess the patient and identify if there is a disorder, and then to talk with the patient in a therapeutic way that helps the patient solve his problems and think about his experiences in different ways.

{¶24} Imar testified that from the initial session on October 3, 2011, his provisional or working diagnosis was depressive disorder, and throughout the course of their therapy sessions, this was the only diagnosis he made of plaintiff.  As set forth in his psychotherapy notes (Defendants' Exhibit 2, p. 110), Imar testified that at the first session plaintiff chiefly complained of depressive symptoms, including poor concentration and inattentiveness.  Imar testified that plaintiff told him about the

February 17, 2010 accident when they met initially, as well as his back problems and his BWC claim.  Imar testified that plaintiff had several stressors that were identified over the course of their therapy sessions, which lasted more than two years, ending on November 26, 2013.  Imar testified that plaintiff's physical problems were one stressor, but that frustration over the BWC claim was another, as was plaintiff's relationship with his girlfriend, at times at least, and also a feeling of being abandoned by his employer.

{¶25} Imar recounted that early on he recommended to Dr. Kunz that plaintiff's antidepressant dosage be increased and he filled out paperwork in support of another short-term disability claim that plaintiff made with Aetna.  Imar stated that he also recommended to plaintiff that he try and get more physical activity, as it is often helpful for individuals with depression, and while he stated that plaintiff's physical problems posed a challenge to engaging in physical activity, his notes from plaintiff's sessions document that plaintiff talked on numerous occasions about having engaged in physical activities, including regularly taking long walks and engaging in other outdoor pursuits, lifting weights, and swimming.  Imar's records also reflect that on October 17, 2011, around the time that plaintiff testified that he experienced an increase in back pain, plaintiff told Imar that he was not having any more back pain and would not go in for an MRI that had been ordered for him.  (Defendants' Exhibit 2, p. 119.)

{¶26} Imar went through his notes from the therapy sessions and offered corresponding testimony about the chronology of plaintiff's therapy.  From Imar's testimony and notes, it was established that plaintiff talked several times about how he had been out driving, apparently on recreational trips.  In general, Imar stated, plaintiff's treatment was longer than most folks require, and his progress was more up and down than most, but he believed that plaintiff wanted to get better and was not malingering. Imar testified that in May 2012 he provided documentation to Met Life in support of plaintiff's long-term disability claim, and he represented to Met Life that plaintiff could

not perform his job given his mental state at that time, largely due to impaired concentration and memory. (Plaintiff's Exhibit N.)

{¶27} Imar related that there were some occasions when plaintiff complained of intermittent back pain to him, but that poor concentration seemed to be the most consistent of plaintiff's complaints. Imar testified that even though poor concentration is symptomatic of depression, it can result from several things other than depression. Imar stated that he was aware plaintiff suffered from sleep apnea, and as he noted in September 2012, plaintiff reported some improvement in his concentration when he wore a mouth guard device to alleviate his sleep apnea symptoms.

{¶28} Imar testified that plaintiff complained repeatedly in 2013 about the course of the BWC claim, and that after the claim settled plaintiff was in much better spirits in September 2013, but Imar stated that his diagnosis remained the same. Imar stated that his last session with plaintiff was November 26, 2013. Imar explained that he does not accept Medicare, so when plaintiff became enrolled in Medicare he referred plaintiff to a colleague who accepted such clients, John McCue, and he received an acknowledgement from McCue indicating that plaintiff made at least one visit. Imar testified that in total he had 35 sessions with plaintiff, and while an employee assistance program apparently paid for the first five sessions, plaintiff paid out of pocket for the rest.

{¶29} Thomas Hubbell, M.D. testified by way of deposition.[1] As set forth in the order issued December 3, 2015, the trial record was held open, in part, to allow for Dr. Hubbell to be deposed. On December 8, 2015, plaintiff filed a transcript of the deposition, with attachments, all of which is hereby ADMITTED as Plaintiff's Exhibit U.

---

[1]The objections raised in the deposition transcript at page 40/line 10; page 48/line 4; page 55/line 2; page 58/line 10; page 62/line 2 (moot); page 73/line 23; page 74/lines 8, 14, and 23; page 77/line 20; page 78/line 10; page 134/line 13; and, page 138/line 2 (moot) are OVERRULED; the objections raised at page 30/line 9; page 38/line 22; page 40/line 3; page 45/line 22; page 58/line 1; page 68/line 11; page 72/line 23; page 75/line 11; page 77/line 23; and, page 138/line 12 are SUSTAINED.

{¶30} On January 15, 2016, contemporaneously with the filing of their post-trial brief, defendants filed a motion to strike portions of Dr. Hubbell's testimony. Plaintiff filed a response on January 29, 2016. On February 5, 2016, defendants filed a motion for leave to file a reply, which is GRANTED instanter.

{¶31} In their motion, defendants request that the court "strike portions of Dr. Hubbell's testimony that attempted to offer expert opinion on proximate cause." Defendants identify two grounds for their motion: (1) "Dr. Hubbell was never disclosed as an expert as required by L.C.C.R. 7(E)" and, (2) "the expert opinion he attempted to provide did not satisfy the standard set out by the Ohio Supreme Court in *Stinson v. England*, 69 Ohio St.3d 451, 633 N.E.2d 532 (1994), paragraph one of the syllabus."

{¶32} Upon review, it is apparent that Dr. Hubbell was not disclosed as an expert as required by L.C.C.R. 7(E), nor was an expert report produced in accordance with L.C.C.R. 7(E). Moreover, in July 2015 plaintiff responded to an interrogatory that asked for the name of each person whom plaintiff expected to call as an expert witness, and the response was that "[p]laintiff has not retained an expert witness at this time." Plaintiff never supplemented that interrogatory response, in contravention of Civ.R. 26(E)(1)(b). Although Dr. Hubbell was identified as a potential witness in plaintiff's pretrial statement, he was identified only as a treating physician and it was not indicated that he would provide expert testimony. Defendants argue that if Dr. Hubbell had been properly identified as an expert witness, defendants may have deposed Dr. Hubbell in discovery and retained an expert of their own.

{¶33} As plaintiff points out, medical records from Dr. Hubbell were produced during discovery and the court has the discretion under L.C.C.R. 7(E) to allow the medical records to serve as a substitute for a written report. Affidavits from plaintiff's counsel and attached email correspondence indicate that Hubbell's records were held out to defendants' original counsel as dispositive evidence on causation issues in this matter, but this was before plaintiff provided the interrogatory response stating that

plaintiff did not have an expert witness. From the records relating to plaintiff's BWC claim, Dr. Hubbell's opinion on the probability of there being a causal relationship between the accident and plaintiff's L4/L5 disc injury was apparent all along. The same cannot be said, however, regarding any causal relationship between the accident and plaintiff's psychological issues, and defendants' reply brief singles out Dr. Hubbell's opinion on this issue as being especially problematic.

{¶34} This is a case involving alleged injuries that are "internal and elusive" rather than the type of observable, external injuries that are within the scope of common knowledge, and, as a result, expert testimony is required to establish a causal connection. *Argie v. Three Little Pigs, Ltd.*, 10th Dist. Franklin No. 11AP-437, 2012-Ohio-667, ¶ 15; *Wright v. Columbus*, 10th Dist. Franklin No. 05AP-432, 2006-Ohio-759, ¶ 19. Therefore, striking Dr. Hubbell's expert opinions for the failure to disclose him as an expert witness would have a prejudicial effect on plaintiff. Nevertheless, plaintiff breached the disclosure provisions of Civ.R. 26(E)(1)(b) and L.C.C.R. 7(E), which had the effect of producing some surprise and prejudicial effect upon defendants, most particularly in relation to Dr. Hubbell's opinions on any causal relationship between the accident and plaintiff's psychological issues and chronic back pain, and the court has a responsibility to ensure that plaintiff does not gain an unfair advantage. *Vaught v. Cleveland Clinic Found.*, 98 Ohio St.3d 485, 2003-Ohio-2181, ¶ 27. Ultimately, though, there is little advantage for plaintiff to gain, for some of the testimony defendants seek to strike does not amount to admissible expert opinion on causation under the standard set out in *Stinson*, and the magistrate does not find Dr. Hubbell to be persuasive on the causation issues relative to plaintiff's psychological issues or his chronic back pain. Although it was intertwined with his testimony about the BWC claim, Dr. Hubbell did give an admissible opinion on the causation issue relative to the L4/L5 disc injury at page 45 of the deposition transcript.

{¶35} Upon review, defendants' motion to strike is GRANTED as to the testimony identified in the motion commencing on pages 30, 38, 57, 68, 72, 75, and 138; the motion is DENIED as to the testimony commencing on pages 39, 45, 62, and 74.

{¶36} Notwithstanding the stricken portions of his testimony, in summary Dr. Hubbell testified that he is board-certified in family medicine and has been in practice for 37 years. Dr. Hubbell explained that he and Dr. Kunz practiced out of the same office in Delaware from 2008 to 2012, when Dr. Kunz relocated. Dr. Hubbell stated that medical records show plaintiff was seen by Dr. Kunz on February 24, 2010, one week after the accident, at which time plaintiff complained of back pain. Regarding the fact that plaintiff did not immediately feel pain in his back at the time of the accident, Dr. Hubbell related that it commonly takes a couple of days for pain to develop in individuals involved in motor vehicle accidents because the pain results from swelling and inflammation processes that take some time to occur. Dr. Hubbell stated that plaintiff visited with Dr. Kunz again on March 1, 2010, at which time plaintiff rated his pain at 6 on a scale of 1 to 10, and Dr. Kunz ordered an x-ray of the lumbar spine. Plaintiff saw Dr. Kunz again on March 29, 2010, Dr. Hubbell stated, and it was noted that plaintiff described pain radiating down into the left leg. As a result of that visit, Dr. Hubbell stated, Dr. Kunz ordered an MRI with a referral to a neurosurgeon.

{¶37} Dr. Hubbell testified that after the MRI was performed on April 5, 2010, the radiologist reported a disc protruding leftward at the L4/L5 level, and Dr. Hubbell stated that he feels this disc protrusion was the cause of the lower back and radicular left leg pain. Dr. Hubbell testified that plaintiff visited with Dr. Kunz again on April 9, 2010, and complained of pain radiating nearly to the left ankle. Dr. Hubbell also testified that plaintiff saw Dr. Kunz on April 23, 2010, and reported that a course of physical therapy he went through on Kunz's advice did not help.

{¶38} According to Dr. Hubbell, following plaintiff's referral to Dr. Meagher for a neurological consultation on April 26, 2010, Dr. Meagher wrote a letter to Dr. Kunz

which contains the first documented instance of plaintiff mentioning the February 17, 2010 accident to a medical provider, and Dr. Meagher related that he felt the disc herniation was the cause of plaintiff's symptoms and he recommended surgery. (Plaintiff's Exhibit R.)    Dr. Hubbell testified that plaintiff was thereafter referred to Dr. Buster for surgical consultation and plaintiff underwent the microdiscectomy procedure on July 6, 2010.

{¶39} Dr. Hubbell stated that the records from plaintiff's visit with Dr. Kunz on July 26, 2010, show that he was much improved at that time.  Dr. Hubbell testified that once plaintiff decided to file a BWC claim, plaintiff was referred to him because he sees patients for those purposes and Dr. Kunz does not.  As Dr. Hubbell related, he saw plaintiff for his BWC claim on September 8, 2010, and he documented plaintiff's injury as lumbar radiculopathy, meaning back pain with pain radiating down the nerve through the left leg, and plaintiff reported to him that his symptoms were much better since having the surgery.  In Dr. Hubbell's opinion, the L4/L5 disc injury and resulting pain in the lower back and left leg were caused by the February 17, 2010 accident. Dr. Hubbell, who continued seeing plaintiff and eventually became his family doctor, stated in general that the condition of plaintiff's lower back was substantially better in the months after the surgery and the radicular pain in his left leg was basically gone, but plaintiff has continued to experience some intermittent back pain from that time onward.

{¶40} Dr. Hubbell testified that on September 17, 2010, Dr. Kunz saw plaintiff for a "DOT physical," as necessary for plaintiff to return to work, and plaintiff returned to see Kunz and finish the corresponding paperwork on October 14, 2010, at which time the only diagnosis noted was monoarthritis.  While Dr. Hubbell testified that he knew plaintiff returned to work in October 2010, it was his understanding that plaintiff was only back on the job "very briefly" and he was not aware plaintiff actually remained on the job until August 2011.  Dr. Hubbell stated that he saw plaintiff on January 12, 2011, and plaintiff complained of left knee and upper leg pain, but no back pain.  Dr. Hubbell

related that after a hearing officer denied plaintiff's BWC claim, he saw plaintiff again on February 16, 2011, to further review the matter, and he did not note any back pain or emotional problems at that time; Dr. Hubbell also related that he noted plaintiff had initially attributed his back pain after the accident "to his prior back troubles," specifically noting "about 2 weeks of impairment in 2005," and for that reason did not mention the accident to Dr. Kunz when he initially sought treatment.

{¶41} Dr. Hubbell stated that on February 18, 2011, plaintiff saw Dr. Kunz for complaints of high blood pressure and headaches, but plaintiff did not complain of back or leg pain, and when plaintiff saw Dr. Hubbell again on June 6, 2011, there was no back or leg pain noted. After the episode when plaintiff felt lightheaded and visited the emergency room on July 8, 2011, plaintiff visited the office later that day, Dr. Hubbell stated, and again there were no complaints of back or leg pain noted. Dr. Hubbell testified that from the records of a follow-up visit with Dr. Kunz on July 15, 2011, plaintiff's complaints were still associated with lightheadedness and a foggy feeling, and Dr. Kunz diagnosed plaintiff with depressive disorder. Dr. Hubbell testified that the record of a subsequent visit with Dr. Kunz on September 12, 2011, shows that plaintiff's depression had improved somewhat.

{¶42} Dr. Hubbell recounted that he saw plaintiff for an appointment on October 4, 2011, and plaintiff complained of low back pain and weakness, with pain radiating to the left leg. According to Dr. Hubbell, he suspected that plaintiff may have suffered a re-injury of the L4/L5 disc herniation, so he ordered an MRI, but he has no knowledge of plaintiff ever following through and undergoing the MRI.

{¶43} Dr. Hubbell stated that he saw plaintiff on December 22, 2011, and March 22, 2012, regarding complaints of depression, and at the latter visit he diagnosed plaintiff with "adjustment reaction with prolonged depressive reaction." From Dr. Hubbell's explanation, he concurred with Dr. Kunz's original diagnosis of depression, but he made this more refined diagnosis which he described as depression resulting

from a longstanding stressful experience. Although Dr. Hubbell testified that the underlying stressful experience here was plaintiff's back injury, he admitted that there is no indication plaintiff complained of back pain at the time he made this diagnosis. Dr. Hubbell also acknowledged that the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, provides that symptoms of this disorder develop "in response to an identifiable stressor occurring within three months of the onset of the stressors," and even though plaintiff was diagnosed far more than three months after the accident, Dr. Hubbell explained that the diagnosis is appropriate in that plaintiff's symptoms developed within three months after plaintiff experienced a "failed recovery" or "stopped improving."

{¶44} Dr. Hubbell testified that plaintiff was later referred for a follow up with Dr. Buster for complaints of back pain, although after seeing plaintiff on April 18, 2012, Dr. Buster sent a letter to Drs. Kunz and Hubbell in which he stated that plaintiff was feeling better after experiencing a few days of severe pain, plaintiff denied any leg pain, and Dr. Buster felt that plaintiff's back pain "should not be attributed directly" to the February 17, 2010 accident. (Defendants' Exhibit 2, p. 16.)

{¶45} Dr. Hubbell testified about several forms that he filled out at different times for plaintiff's long-term disability claim with Met Life, in which the primary diagnosis he reported to Met Life was back pain, with a secondary diagnosis of adjustment reaction with prolonged depression. Dr. Hubbell acknowledged that in an April 2012 Met Life application, he indicated that he had advised plaintiff to return to work in October 2010, but he later explained that he was confused and actually did not think plaintiff was capable in April 2012 of returning to work. Dr. Hubbell stated that in subsequent Met Life paperwork he indicated that plaintiff was capable of working up to 4 hours a day, and that he had suggested to plaintiff that he look into vocational rehabilitation and psychological counseling. Dr. Hubbell also stated that Met Life contacted him in June 2013 and asked him to comment on the "apparent incongruence" between

plaintiff's driving his RV and his fear of driving a truck, to which he responded simply that "there is a big difference" between driving a tractor-trailer and an RV.  (Defendants' Exhibit 2, p. 51.)

{¶46} Dr. Hubbell stated that when he saw plaintiff for a visit on May 9, 2013, plaintiff complained of back pain, but plaintiff also told him that the reason his back hurt was he had been working, specifically lifting and carrying merchandise between his garage and van a few days earlier.  (Defendants' Exhibit 2, p. 44.)  Dr. Hubbell stated that when he saw plaintiff for a visit on December 9, 2014, plaintiff did complain about back pain, among other things, but no such complaints were noted during the last visit for which medical records were available, on May 12, 2015.

{¶47} "[I]n order to establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom."  *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981).  As previously stated, the parties stipulated to liability in this matter.  Therefore, the trial pertained to establishing the damages associated with any injury proximately caused by defendants' negligence.  "As a general rule, the appropriate measure of damages in a tort action is the amount which will compensate and make the plaintiff whole."  *N. Coast Premier Soccer, LLC v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-589, 2013-Ohio-1677, ¶ 17.

{¶48} Upon review of the evidence presented by the parties, the magistrate finds as follows.  In the early morning of February 17, 2010, plaintiff was driving a tractor-trailer westbound on U.S. 30 in Allen County in the course of his employment with UPS Freight, headed toward Chicago on a route that he regularly traveled to make deliveries to Advance Auto Parts stores.  Plaintiff proceeded into the passing lane to pass an ODOT snowplow truck and an automobile following the snowplow truck.  As a result of negligence on the part of ODOT, a metal skid shoe broke free from the snowplow and suddenly entered plaintiff's lane of travel.  The truck jerked abruptly from side to side as

multiple tires blew apart upon running over the skid shoe.  Plaintiff had to wrestle with the steering wheel to maintain control of the truck and pull off the highway.  In the immediate aftermath of the accident, when plaintiff was busy crawling under the truck to plug a hole in a fuel tank punctured by the skid shoe, call his employer, and talk to the ODOT supervisor and OSHP trooper who came to the scene, plaintiff did not notice any pain, but once repairs were made and he proceeded on to a nearby truck stop, he started to notice some back pain.  By the time plaintiff reached the end of his route in Illinois later that day, the back pain was much worse.  Severe back pain persisted over the next few days, alleviating only slightly when plaintiff took ibuprofen.  By February 23, 2010, the pain was radiating into the left leg, plaintiff made an appointment to see his doctor the next day, and, in contrast to his extensive work history and record of never missing a day at UPS Freight due to illness, plaintiff was unable to work.  Plaintiff went on short-term disability on or about March 5, 2010, and although the claims representative who processed the claim did not note the disability to be work-related, the application was made over the phone by plaintiff's girlfriend, rather than plaintiff himself.

**{¶49}** Plaintiff had a history of intermittent lower back pain, but the persistent severity and radiating nature of the pain he experienced at this time was different from his prior symptoms.  Although plaintiff did not mention the accident to Dr. Kunz initially, once plaintiff realized this injury was not going away and was different than the back problems he had dealt with over the years, he informed Dr. Meagher about the accident on April 26, 2010.  After prescription pain medication and physical therapy proved ineffective, plaintiff underwent a microdiscectomy operation on July 6, 2010, followed by more physical therapy.  By October 2010, the lower back pain and left leg pain had basically subsided and plaintiff returned to work.

**{¶50}** In August 2011, the onset of psychological issues which were diagnosed as depression led plaintiff to stop working for UPS Freight, although plaintiff later

worked part-time on some business ventures of his own. After the onset of the psychological issues, plaintiff went on short-term disability followed by long-term disability, and he also receives SSDI income. Up to the present time, plaintiff has continued to experience psychological issues, and he has experienced some intermittent lower back pain, but the back pain is substantially equivalent to what he experienced prior to the accident.

{¶51} Plaintiff has established that, as a result of negligence on the part of ODOT, it is more probable than not that he was proximately caused to suffer an injury at the L4/L5 level of his spine. As a result of that injury, plaintiff suffered significant pain in his lower back that radiated into his left leg, he had to undergo surgery and other medical treatment for which he incurred some expenses out of pocket, and he incurred lost wages while off of work from approximately February 23, 2010, to October 16, 2010, or about 34 weeks. Between the pain and discomfort that plaintiff suffered and his recovery from surgery, he was limited in the physical activities that he could engage in until around the time that he returned to work, but he was able to resume such activities thereafter.

{¶52} Plaintiff did not establish that a causal relationship exists between ODOT's negligence and any ailments he has experienced, whether physical or psychological, after October 2010. Although plaintiff has continued to experience some intermittent lower back pain, it is different than the more severe and persistent lower back and radiating left leg pain he experienced in the time between the accident and his surgery, and it is comparable to the preexisting intermittent back pain he developed over many years of driving trucks and operating heavy equipment. Furthermore, some doubt is cast on the seriousness of plaintiff's intermittent complaints of back pain after the surgery considering that he chose not to follow through and get an MRI when one was ordered for him. The surgery that plaintiff underwent essentially repaired the injury that he suffered as a result of the accident, and while it had the goal of at least alleviating

the radicular pain, it was understood when plaintiff had the surgery that it would not render him completely free of back pain. Moreover, as detailed above, Dr. Hubbell's opinion regarding causation as it relates to plaintiff's chronic back pain is not admitted and, in any event, it was not persuasive.

{¶53} Concerning plaintiff's psychological issues, again, Dr. Hubbell's opinion on causation was not admitted, and even if it were, it is not at all persuasive. Dr. Hubbell's testimony that a "failed recovery" brought about plaintiff's depression is not consistent with the fact that plaintiff's physical condition after the surgery substantially returned to what it had been before the accident, and that theory is also dubious in light of Dr. Hubbell's erroneous belief that plaintiff only returned to work for UPS Freight "very briefly" after the surgery. It is also worth noting that Dr. Kunz did not refer plaintiff to Dr. Hubbell, his BWC physician at the time, when the psychological issues manifested, and plaintiff did not base his BWC claim upon those issues. Plaintiff clearly had other stressors in his life that may have played a role in his depression, according to Imar, who is not a doctor and cannot causally relate the psychological issues to the accident. And, in recent years plaintiff has undergone minimal treatment for any psychological issues. The evidence simply does not support the conclusion that the accident caused plaintiff any psychological issues, let alone issues that would render him permanently unable to work.

{¶54} Based upon the totality of the evidence, the magistrate finds that the amount of plaintiff's damages is as follows: (1) lost wages in the amount of $35,345.04, representing 34 weeks of lost work at the stipulated average weekly rate of pay of $1,039.56; (2) out of pocket medical expenses in the amount of $2,489.97, representing the relevant medical expenses incurred by plaintiff through October 2010; (3) past pain and suffering in the amount of $35,000; and, (4) the $25 filing fee plaintiff paid to commence this action.

{¶55} It is undisputed that plaintiff's recovery must be offset by certain collateral sources pursuant to R.C. 2743.02(D), which states, in relevant part: "Recoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant." The parties filed a joint stipulation concerning collateral sources on January 8, 2016, which is hereby APPROVED. *See also* Joint Exhibit A. Using the stipulated figures, and based upon the findings above concerning the nature of plaintiff's damages, including their temporal duration, plaintiff's recovery against the state shall be reduced by the amount of the settlement in his BWC claim ($40,000) and by the amount of the short-term disability income he received in 2010 ($10,939.20), for a total reduction of $50,939.20. Reducing plaintiff's $72,860.01 in total damages by the $50,939.20 in collateral sources results in an aggregate recovery for plaintiff in the amount of $21,920.81.

{¶56} Based upon the foregoing, the magistrate finds that plaintiff is entitled to recover damages in the amount of $21,920.81. Accordingly, it is recommended that judgment be entered for plaintiff in that amount.

{¶57} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

Case No. 2012-01937          -23-          DECISION

cc:

Gregory R. Mansell
1457 South High Street
Columbus, Ohio 43207

James P. Dinsmore
Jeanna V. Jacobus
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed July 27, 2016**
**Sent to S.C. Reporter 8/24/16**